# CHARLES W. BATES v. COMSTOCK REALTY COMPANY, Appellant.

### In Banc, December 30, 1924.

1. **SPECIAL TAX BILL: Lien on Land: Suit in Equity.** An action to enforce a special tax bill as a lien on land is a suit in equity.

2. ——: ——: ——: **Trial by Jury: Constitutional Right.** The provision of the Constitution of 1875 that "the right of trial by jury, as heretofore enjoyed, shall remain inviolate" means the right of trial by jury as it existed at common law, where such right was not given by the Constitutions of 1820 and 1865. Neither the Constitution of 1865, nor the Constitution of 1820, gave to either party the right to a trial by jury in a suit to enforce a special tax bill as a lien on land, nor did such right exist at common law where the statute which gave the lien did not provide a remedy for enforcing it, but such a suit is one in equity, and no constitutional right is denied to the taxpayer by a denial of a jury to determine the validity of such tax bill and lien.

3. ——: ——: ——: ——: **Prior Practice: Acquiescence.** The mere fact that prior to 1875 the parties to suits on special tax bills by tacit agreement tried their causes to a jury, or out of abundant caution caused the record to show an express waiver of a jury, does not of itself establish the right of trial by jury; and there being no express decision that either party was entitled to trial by jury, and no statute conferring such right, it cannot be ruled that the Constitution of 1875 preserved the right of trial by jury in such cases, for the right of a trial by jury to enforce the tax bill as a lien did not exist at common law where the statute makes the tax bill a lien but provides no specific remedy for enforcing it.

4. ——: ——: ——: **No Statutory Remedy.** Special assessments for local improvements are not debts, nor can a personal judgment be rendered for their recovery, but the special tax is merely a lien on the property against which it is assessed, and its payment can be enforced only through the enforcement of the lien, and the lien itself is purely statutory; but where neither the statute nor the charter gives a specific remedy for the enforcement of the lien, equity alone can supply the remedy; and where the charter declares that the tax bill shall constitute a lien against the land, but prescribes no particular method for enforcing the lien, but does provide that it "may be collected by action in any court of com-

Bates v. Comstock Realty Co.

petent jurisdiction," the appropriate remedy for enforcing the tax bill as a lien against the land is a suit in equity, and therefore the issues are not triable by a jury.

5. ———: Authentication: Signature of President of Board of Public Service. Special tax bills signed: "By order of the Board of Public Service, Leo Osthaus, Assessor of Special Taxes; Registered and certified, Paul Young, Jr., by order of the Comptroller," are authenticated in literal compliance with the provisions of the charter of St. Louis; and the signature of the president of the Board of Public Service, in view of the charter provision authorizing the president "to designate an assistant or clerk or other subordinate to sign the name of the president," was not necessary to give effect to the tax bills, the board having by resolution authorized Osthaus to sign such tax bills and the comptroller having in writing designated Young to countersign special tax bills, in accordance with charter provisions.

6. ———: Conformance to State Laws. The city of St. Louis has authority to deal with matters of essentially local municipal concern, and for that reason sewer special tax bills are not void simply because in some respects they are not in harmony with state laws touching the same subject-matter.

7. ———: Assessment in Excess of Benefit: Sewer District. That the tax assessed against individual lots in a joint sewer district is in excess of the benefits conferred is a legislative, and not a judicial, question. But where all the property in the district is served by an existing sewer, which in times of heavy rains is doubly overcharged, and the new joint district sewer is auxiliary to the existing sewer and enables it to function at times of heavy rain fall, and with the aid of the new sewer the storm sewerage of the entire district is given an effective outlet, the benefit is manifest.

8. ———: Piling: Quicksand: Allowance for Double Rows: Contrary to Contract. The sewer, sixteen and a half feet wide and deep, for a distance of 1990 feet from the river, was constructed in an open cut, and in this cut steel-sheet piling was used to hold the walls of earth intact during the construction. Because quicksand was encountered throughout the entire distance two rows of piling were deemed necessary and were driven, for all of which the contractor was allowed the contract price of $1.25 per square foot, and it is the contention of the defendant taxpayer that by the terms of the contract the contractor was bound to use piling of such weight that one row would have sufficed to hold the walls intact, and consequently he was not entitled to be allowed payment for

two rows. The contract is not set out in the record, but such parts of it as have been abstracted indicate that the use of steel-sheet piling was left entirely to the judgment and discretion of the sewer commissioner, and he testified that, in order to build the sewer and to keep out the quicksand, it was necessary to use two rows of piling, and it does not appear from his testimony that the two rows were not ordered by him, or that one row of greater weight would have adequately served the engineering purpose. *Held*, that it cannot be ruled that the allowance for steel-sheet piling was not in strict conformity with the terms of the contract.

9. ———: **Concrete Classification: Final Authority of Engineer.** Where the contract for the construction of the sewer, through rock and earth, provided that "the sewer commissioner shall, in all cases, determine the amount or quantity or the classification of the several kinds of work or material which are to be paid for under this agreement, and he shall decide all questions which may arise relative to the execution of this agreement, and his decisions shall be final and conclusive," his classification of the concrete work, by transferring a certain number of yards from one class to another (for which a higher price was allowed), in the absence of other provisions of the contract from the record, and in the absence of any showing of fraud or collusion, was final and conclusive.

10. ———: **Pumping: Quantity: Per Meter Measurement.** Where the contractor for the sewer was allowed a certain sum for pumping water from shafts, an objection to the allowance based solely on the fact that the water was not measured by meter cannot be allowed, where the contract did not expressly require that it be so measured, and it is not claimed that the amount of water for which the allowance was made was not in fact pumped, or that the method of computation was not accurate.

Citations to Headnotes: 1 to 4, Juries, 35 C. J. par. 35; 5 to 7, Municipal Corporations, 28 Cyc. 1169, 305, 1128; 8 to 10, Judicial Sales, 35 C. J. par. 11.

Appeal from St. Louis City Circuit Court. —*Hon. Robert W. Hall*, Judge.

AFFIRMED.

*H. A. Loevy* and *Albert Chandler* for appellant.

(1) The right of trial by jury in special tax cases was "enjoyed" before the adoption of the Constitution

of 1875. St. Louis v. Armstrong, 38 Mo. 31, 33; Creamer
v. Bates, 49 Mo. 525; St. Louis v. Allen, 53 Mo. 44; Kiley
v. Oppenheim, 55 Mo. 374; Neenan v. Smith, 60 Mo. 295;
Seibert v. Allen, 61 Mo. 482. The right, therefore, "re-
mained inviolate." . This was recognized in the subse-
quent trial of the following cases in this court: Shee-
han v. Owen, 82 Mo. 460; Asphalt Pav. Co. v. Ulman,
137 Mo. 560; Independence v. Knoepler, 205 Mo. 339.
And in the following, it is expressly stated that a jury
was waived: State ex rel. v. Ellison, 277 Mo. 50; Pren-
dergast v. Goldsmith, 273 Mo. 184; Ruecking v. With-
nell, 269 Mo. 553; Securities Co. v. Kansas City, 265 Mo.
258; Mullins v. Cemetery Assn., 259 Mo. 147. No re-
ported case on a special tax bill in Missouri can be found
where a jury trial was asked for and was denied. (2)
The tax bills are not admissible in evidence. They
should have been excluded. They bear neither the sig-
natures, nor the name, of any city official or head of a
department. Whether signed manually by himself or an
authorized subordinate in his name, the signature to a
tax bill by or in the name of a city officer makes a prima-
facie case on the theory that his certificate under his offi-
cial oath stands for proof. Here the Charter and Re-
vised Code and special ordinances for this sewer require
signature of the then comptroller and the then president
of the Board of Public Service, subordinates can be and
were authorized to do the manual work of attaching said
signatures; but the employees signed only their own
names, and omitted those of the two city officers alto-
gether. Such a bill is a nullity, and the objection to its
introduction in evidence should have been sustained.
Eyerman v. Payne, 28 Mo. App. 72; Nevada v. Eddy,
123 Mo. 546; Heman v. Loevy, 179 Mo. 455; Jaicks v.
Merrill, 201 Mo. 91; St. Louis v. Brinckwirth, 204 Mo.
301; Porter v. Boyd Paving Co., 214 Mo. 1; State ex rel.
v. Reber, 226 Mo. 229; Himmelman v. Danos, 35 Cal. 451;
St. Louis Charter 1914, art. 23, sec. 1; St. Louis Revised
Code 1914, sec. 183, p. 874; St. Louis Revised Code 1914,

sec. 796, p. 1017. (3) The St. Louis Charter provisions, defining classes of sewers and authorizing the taxing of property for sewers in this case, are void because out of harmony with the uniform state law on the subject which defines what such classes are. Constitution, art. 9, sec. 16; Constitution, art. 9, sec. 23; R. S. 1919, secs. 7583, 8131, 8304, 8482, 8734, 8769; Laws 1853, p. 253; Laws 1859, p. 165; 1901 Charter, art. 6, sec. 20; Lockwood v. St. Louis, 24 Mo. 22; Ewing v. Hoblitzelle, 85 Mo. 64; Manker v. Faulhaber, 94 Mo. 442; Badgley v. St. Louis, 149 Mo. 122; Owen v. Baer, 154 Mo. 434; State ex rel. v. Commissioners, 184 Mo. 132; St. Louis v. Myer, 185 Mo. 583. There are limits to home rule for St. Louis beyond which neither the charter nor the State can go without violating the Federal and State constitutions. To uphold the charter provisions here would involve the absurdity of surrendering the police power. Transbarger v. Railroad, 250 Mo. 55, 238 U. S. 77; Stone v. Mississippi, 101 U. S. 814; Van Cleve v. Sewerage Com., 71 N. J. L. 183; Railway v. Drainage Com., 200 U. S. 592; Bacon v. Walker, 204 U. S. 317; Railway v. Ohio, 173 U. S. 292; Houck v. Little River Dist., 238 Mo. 373, 239 U. S. 254; Virginia v. West Virginia, 220 U. S. 28; Texas v. White, 7 Wall. 721; Mo. Constitution, art. 9, sec. 25; U. S. Constitution, art. 4, sec. 3. (4) The assessments being in substantial excess of any benefits received are void. They are a taking without due process in violation of the Fourteenth Amendment. And the area taxed having entirely unequal relations to the improvement, the blind obedience to a rule of apportionment that ignores the facts of the situation is a denial of the equal protection of the laws, also in violation of the Fourteenth Amendment of the Federal Constitution and the similar provisions of our State Constitution. Garret v. St. Louis, 25 Mo. 505; Corrigan v. Gage, 68 Mo. 544; St. Joseph v. Farrell, 106 Mo. 437; Moberly v. Hogan, 131 Mo. 19; Skinker v. Heman, 148 Mo. 355; Heman v. Allen, 156 Mo. 546; Barber Asphalt Co. v. French, 158 Mo.

543; Spencer v. Merchant, 125 U. S. 345; State ex rel. v. Oliver, 273 Mo. 542; Birmingham Drainage Dist. v. Railroad, 274 Mo. 140; Wetterau v. Trust Co., 285 Mo. 561. (5) Overcharges in three items included in computation of cost and in the tax bills: (a) improper classification of excavation; (b) illegal method of ascertaining pumpage and (c) improper inclusion of cost of unauthorized drop shaft being proven, the "recovery on the tax bill shall be reduced accordingly" under the express provisions of the St. Louis Charter. They are additional evidence of fraud. 1914 St. Louis Charter, art. 23, sec. 4. (6) The tax bills on the first section are void for failure to obey the charter provisions as to the manner of making the computation of the cost and the assessment, namely, that same must be levied and assessed by the Board of Public Service. 1914 St. Louis Charter, art. 22, sec. 18.

*Bates, Williams & Baron* for respondent.

(1) The tax bills make a prima-facie case. Their validity is presumed and the burden is upon those contesting the tax bills to prove their invalidity. All the testimony in these suits tended to support the validity of the special tax bills and there is none to the contrary. St. Louis Malleable Castings Co. v. Prendergast Constr. Co., 288 Mo. 197, affirmed 260 U. S. 469; Parker-Washington Company v. Field, 202 Mo. App. 159; Delmar Investment Co. v. Lewis, 271 Mo. 322; Collins v. Jaicks Co., 279 Mo. 404; Charter of St. Louis, art. 6. sec. 25. (2) The question of whether appellants' lots are or are not benefited by the construction of the sewer is a legislative and not a judicial question, and when the Municipal Assembly has adjudged that they are benefited and fixed the ratio of the benefit, by establishing the joint sewer district, such judgment of the Assembly is conclusive, and the owner of property in the district cannot contend in court that his property was not

benefited. McMurry v. Kansas City, 283 Mo. 494; Meier v. St. Louis, 180 Mo. 409; McGhee v. Walsh, 249 Mo. 283; Prior v. Construction Co., 170 Mo. 451; Jennings Heights L. & I. Co. v. St. Louis, 257 Mo. 291; Moberly v. Hogan, 131 Mo. 19; Mt. St. Mary's Cemetery Assn. v. Mullins, 248 U. S. 501; Hancock v. City of Muskogee, 250 U. S. 454; Miller & Lux v. Sacramento Drainage Dist., 256 U. S. 129; Valley Farms Co. v. County of Westchester, 261 U. S. 162. The above rule is universal unless the property is so situated that it could not, as a matter of law, be benefited, which is not the case at bar. (3) The fact that the Old Mill Creek Sewer was a public sewer is of no consequence. Prior v. Construction Co., 170 Mo. 439; McMurry v. Kansas City, 283 Mo. 479; Collins v. Jaicks, 279 Mo. 404; Land & Improvement Co. v. Kansas City, 173 Mo. 523. (4) Before a court of equity will enjoin the collection of the tax on account of its being excessive, or make a deduction from the amount of the tax bills, the plaintiff must tender the amount which he conceives to be actually due and just. Porter v. Paving Co., 214 Mo. 1; Johnson v. Duer, 115 Mo. 366. (5) The charter of the city of St. Louis under which this work was done makes such tender necessary. Charter 1902, art. 6, sec. 25. (6) It was proper for the tax bills to be signed in their respective names by the assessor of special taxes designated by the Board of Public Service for that purpose and to be countersigned, registered and certified by the deputy comptrollers designated by the comptroller for that purpose. The charter adopted on June 30, 1914, so expressly provides. Sections 2, 4, 6 and 10 of the Schedule of the Charter; Barber Asphalt Paving Company v. Hayward, 248 Mo. 280; Fyerman v. Blakesley, 13 Mo. App. 407; First National Bank v. Shewalter, 153 Mo. App. 635; Construction Company v. Haeussler, 201 Mo. 400; Paving Company v. McManus, 144 Mo. App. 593. (7) Jury trials are not demandable in actions brought to enforce the lien of

special tax bills. (a) The jury was not demandable at common law in any action to enforce the collection of taxes, general or special. (b) Special assessments on local improvements are referable to the taxing powers of the State. (c) The proceeding by suit to enforce the lien of a special tax bill is not judicial in a strict sense; it is but a step in an administrative proceeding in which judicial assistance is invoked as a matter of convenience, and because with its assistance the rights of parties can be most surely protected and the public interests at the same time conserved. 2 Cooley on Taxation (3 Ed.) 875, 876; 2 Cooley on Taxation (3 Ed.) 828, 829; · 1 Cooley on Taxation (3 Ed.) 51-55. (d) The remedy which a state had at common law was forfeiture of the lands or chattels of the person taxed or by restraint of his property. It was a summary proceeding. Until by statute or charter municipalities of this State were given the right to resort to legal proceedings for the enforcement of the lien of special taxes, the only remedy the municipalities had was collection by summary process. City of Carondelet v. Picot, 38 Mo. 125. (e) The provision of the Constitution of the State of Missouri that the "right of trial by jury as heretofore enjoyed shall remain inviolate" means the right of trial by jury as it existed at common law. Eckrich v. Transit Company, 176 Mo. 648; State ex rel. v. Withrow, 133 Mo. 501; State v. Bockstruck, 136 Mo. 335. The Constitution does not extend the right. Ely v. Coontz, 167 Mo. 371. (f) Actions on special tax bills were unknown at common law. Hence there is no common-law right of trial by jury preserved inviolate by our Constitution. State ex rel. v. Oliver, 273 Mo. 537. No statute in this State extends the right of trial by jury to a case of this class. This case is not one for the recovery of a money judgment or to recover specific real estate, but is to foreclose the lien of special tax bills and cannot result in personal judgments against the defendants. Secs. 1398, 1399, R. S. 1919; Barber

Asphalt Paving Co. v. Hezel, 138 Mo. 228. (f) The Charter of 1902, art. 6, sec. 25, provided that special tax bills should be collected "as any other claim in any court of competent jurisdiction." The Charter of 1914, art. 23, sec. 5, provides that special tax bills "may be collected by action in any court of competent jurisdiction." The method of procedure provided in these charters means by such procedure "as is adapted to the enforcement of the lien." Construction Company v. Ice Rink Co., 242 Mo. 241. (h) Whether this proceeding is a suit in equity or a statutory action at law is immaterial so far as the question of right of jury trial is concerned, for in either event no jury is demandable. Equity always has had, and still has, jurisdiction to enforce liens. Pomeroy on Equity Jurisprudence (4 Ed.) secs. 112, 165-167. If a statute or charter gives a lien for taxes and provides no particular mode to enforce the lien equity will then supply a remedy. The only limitation upon this doctrine is where the statute creates a complete procedure for the enforcement of the lien. Kansas City v. Field, 285 Mo. 253.

RAGLAND, J.—This is a suit on two special tax bills issued and delivered to the Carter Construction Company by the city of St. Louis, evidencing assessments made against property of defendant for the payment in part of the cost of construction of what is known as the Mill Creek Joint District Sewer.

The improvement was made, and tax bills issued to pay for it, pursuant to three ordinances approved July 3, 1914. The first established a joint sewer district, to be known as "Mill Creek Joint Sewer District." The second and third authorized and directed the Board of Public Improvements to let contracts for the construction respectively of the first and second sections of a Mill Creek Joint District Sewer, in accordance with the plans and specifications on file in its office.

The boundaries of the Mill Creek Joint Sewer
District as established by the ordinance are substan-
tially coterminous with those of the natural watershed
known as the Mill Creek Valley, which extends west-
wardly from the Mississippi River and comprises a
territory of approximately 5122 acres. For many years
prior to the construction of the joint district sewer
giving rise to the present controversy this area was
drained by a system of sewers consisting of a main
sewer, the "Mill Creek Sewer," extending in a west-
erly direction from the Mississippi River a distance
of three and one-half miles, and laterals which came
into it from both the north and the south. At the time
of the passage of the ordinances just referred to these
sewers were entirely adequate for the carrying off of
the sanitary sewage which flowed into them during dry
weather, but during heavy rains the main sewer became
overcharged and the water flowed out through the man-
holes and backed up through the laterals and flooded
basements in territory on both the north and the south
sides of it. The joint district sewer was designed to
relieve this condition and was so constructed as to
become an auxiliary of the main sewer during the times
in which storm water is seeking an outlet.

The new Mill Creek Joint District Sewer lies im-
mediately south of the old Mill Creek Sewer and par-
allels it, but has no direct connection with it. Nor does
the new sewer communicate directly with any of the
laterals on the north side of the old one. But it does
receive the water flowing through the laterals on the
south side after it reaches a certain volume. By reason
of this connection the new sewer carries approximately
one-half of the flood water that formerly sought outlet
through the old one in times of heavy rains. The new
sewer is of concrete construction, built in the shape of
a horseshoe and having dimensions of sixteen and one-
half feet both horizontally and vertically. From the river

306 Mo.—21

for a distance of 1990 feet it was constructed in an open cut; the remainder of it was tunneled through rock. For the purpose of construction it was divided into two sections and a separate contract was let for each. The Carter Construction Company was awarded both, however. Under these contracts the work and material were classified and were to be paid for by the quantity. The bids were based on a "unit price" which was defined to mean "the price . . . of the separate articles of material in place and the labor necessary to render a complete sewer according to the plans and specifications." According to the bids and estimates the first section was to cost $1,399,924.20, and the second section $1,672,532.

The second section of the sewer was completed and accepted by the city in April, 1916, and the first section in May, 1916. Computations of the cost, alleged to be in conformity with the terms of the contracts, were made under the supervision of the president of the Board of Public Service. According to such computations the cost of the first section was $1,673,611.80, and that of the second section $1,760,038.22. These two sums were each levied and assessed by the Board of Public Service as a special tax ratably by area on all lots or parcels of ground within the joint sewer district, excluding public highways, as provided by the charter then in force. Based on these assessments tax bills were issued. They were signed as follow:

"By order of the Board of Public Service.
        "(Signed) Leo Osthaus,
        "Assessor of Special Taxes
"Registered and certified, (signed), Paul Young, Jr.,
        "By order of the Comptroller."

The two tax bills in suit are for the assessments made against defendant's property for its proportion of the cost of the two sections of the sewer respectively. Plaintiff is the assignee and holder.

Other facts having an immediate bearing on the questions presented for decisions will be stated in connection with their consideration.

The petition is in two counts, one for each tax bill, and is conventional. The answer is quite long. A synopsis of it was made by defendant's counsel in their principal brief as follows:

"(1) Denial that contractor did work required in conformity with contract, denial that city officials properly computed the costs of the sewer and duly levied and assessed the cost, denial that the tax bills are lawful liens.

"(2) That charter classification of public sewers is arbitrary, oppressive and void, that the sewer in question was a public sewer but was falsely and fraudulently named 'Joint District Sewer' so that property owners would have to pay for it, whereby the burden of payment was arbitrarily, unreasonably, and oppressively shifted from public funds to private property; that this sewer is intended and designed to carry off *surface water only and not house or sanitary drainage at all.*

"(3) That charter, Sec. 22, Art. 6, provides that the whole cost of the joint district sewer will be assessed against the real property in the district; that the benefit to the real property in the sewer district (if there is any benefit therein which is not admitted) is much less than the alleged cost of the sewer, in fact it is no benefit at all to the defendants, that special tax bills cannot lawfully be for more than the benefit to the property, that if the cost exceeds the benefit, the municipality should pay same, wherefore, the provision that the total cost shall be assessed against the property is unlawful, oppressive ·and unreasonable and in violation of Sections 20, 21 and 30, Article 2, of Missouri Constitution and the Fourteenth Amendment of the Federal Constitution.

"(4) That charter, Sec. 22, Art. 2, provides that if the proposed joint district sewer is to drain territory out-

side of the city limits, the Municipal Assembly shall in the sewer ordinance provide that the city shall pay such proportions of the entire cost as the territory outside of the city limits bears to the entire district; that this sewer drains 11,000 acres in St. Louis County, and as the total area of the sewer district is 16,000 acres, the city should pay eleven-sixteenths of the cost of the sewer, which the ordinances here fail to do and are therefore null and void.

"(5) That the sewer was intended only as a relief storm sewer to relieve the original Mill Creek Public Sewer, that it was not intended to carry house or private sewage and is not used for same, and that there was no need for additional sewer facilities; that even if it had been necessary to construct a new storm sewer, one which was one-half of the size mentioned would have been ample and, therefore, the tax bills are void, unreasonable and excessive.

"(6) That there are four lateral sewers in the southern half of the district, and that it is only in case of extraordinary rain (if at all) that by means of an opening in each lateral sewer that storm water overflow empties in the new sewer, through a drop shaft; that none of the territory in the district north of the old sewer drains or is drained or is intended to drain into the new sewer and it is therefore entirely useless to the property owners in the northern part of the district; that their property cannot be benefited thereby, and therefore the tax bills are void and illegal, are in violation of paragraph 1 of Fourteenth Amendment of Federal Constitution and of Sections 20, 21 and 30 of Article 2 of Missouri Constitution.

"(7) That the proceedings and naming this sewer to be a 'joint district' sewer and not a 'public' sewer is in violation of paragraph 1 of Fourteenth Amendment of Federal Constitution in that the property of defendants is sought to be taken without due process of law and also in violation of Sections 20, 21 and 30 of Article 2 of Missouri Constitution.

"(8)   That the sewer is much larger than was necessary to provide for drainage only within the city limits and that it was made specially large for the benefit of residents of St. Louis County; therefore, the ordinances are void and null in violation of Section 22 of Article 6 of the charter and of the provisions aforesaid of State and Federal constitutions.

"(9)   That the tax bills were issued before the work of construction was completed by the contractor; that the plans, specifications and contract were not complied with, but purposely ignored and departed from by the contractor with the knowledge and approval of the Board of Public Service; that the cost was $350,000 greater by reason of changes specified.

"(10)   That the charter contains absolutely no provision for notice to the property owners of the intention to initiate sewer ordinance, nor any notice thereof of hearings to be held by the board, and no notice was given to the property owners at any time; that defendants had no knowledge of the work being done, or of the contract being let, or of the sewer being constructed until after the tax bills were issued, when they were notified thereof by the contractor; that by such failure in the charter to provide for notice the ordinances and tax bills are null and void and in violation of paragraph 1, Fourteenth Amendment, and of the aforesaid Sections 20, 21 and 30 of Article 2 of Missouri Constitution.

"(11)   That the sewer district comprises 1186 city blocks, embracing 23,500 separate lots, and its area is five miles square (twenty-five square miles), it lies in the central part of the city in the lowest part of a natural drainage district or watershed, known as Mill Creek Valley, which contains 1864 acres; that the sewer is worthless and useless, because the bottom of the sewer is level from beginning to end, therefore, there can be no drainage into the Mississippi River.

"(12)   That the ordinances are fraudulent, illegal and arbitrary because thereby the property of defendant

is charged or subjected to greater expense and cost than was necessary, and that such charge or, at least, to the extent of such excess, is taking private property without compensation, contrary to Section 21, Art. 2, Missouri Constitution; that it was· fraudulent to give a public sewer the name of 'joint district sewer,' so as to force property owners to pay for same instead of the public treasury, and that it was fraudulent to create a sewer district and also provide drainage facilities for St. Louis County without providing that the city should pay for that portion of the cost in express violation of Sections 20 to 25 inclusive of Article 6 of the charter.

### "PRAYER

"Wherefore, defendants say both tax bills are illegal, null and void, that they demand a trial by jury of the issues herein, and go hence without day and recover cost."

The reply is a general denial and a plea of estoppel *in pais;* that defendant "stood silently by and suffered said joint sewer district to be formed, said proceedings to be had, said contracts to be let and said work to be done, knowing that the same would benefit their property and they would be called upon to pay their proportionate share of the cost thereof."

Defendant's request for a trial to a jury was denied. The court after hearing the evidence found the issues for plaintiff on each count and rendered a judgment which was in effect a foreclosure of the liens of the special tax bills. From such judgment defendant prosecutes this appeal.

Appellant assigns error as follows:

The court erred: (1) in denying defendants a jury trial; (2) in admitting the tax bills in evidence over the objection of defendants, because not properly authenticated; (3) in failing to hold the St. Louis charter provisions here involved to be void because out of harmony with the uniform state law on the subject: (4) in refusing to find for appellant on ground that the property

charged was shown to have sustained no benefit at all to support the lien; (5) in holding the new Mill Creek Sewer to be a joint district sewer instead of a public sewer; (6) in failing to hold that the whole proceeding culminating in the issue of the tax bills was an unreasonable abuse of power, a fraud on the taxpayers, arbitrary and oppressive and in violation of State and Federal Constitutions; (7) in refusing instruction or declarations of law asked by appellants; (8) in failing to reduce the tax bills by the amount of illegal and excessive charges included therein with the result that the judgment is excessive; and (9) in holding that the sewer was completed in accordance with contract, plans and specifications and holding that the tax bills sued on could be issued before the sewer was completed.

In addition to the foregoing assignments appellant adopted and set out the appellant's assignments of error in the case of Haeussler Inv. Co. v. Bates, a companion case argued and submitted in connection with this one. Those assignments sufficiently appear from the opinion in that case and need not be repeated here.

It is claimed that there are some important distinctions between this case and the Haeussler case growing out of the different forms of procedure employed. The latter was an action in equity to cancel some of the special tax bills, while the present case is, it is said, an action of law. Hence the questions of the right to a jury trial, and some others, are presented in this case which were not raised in the other.

I.  It is not contended that the right to a trial by jury in this case is conferred by the charter of the city of St. Louis or by any statute. The constitutional provisions alone are relied upon. The question presented has never been directly passed upon in this State. However, many cases heard on appeal in this court and the Courts of Appeals, both before and since 1875, in which it incidentally appears from the opinions therein that they were tried to a jury

Trial by Jury.

*nisi*, or that a jury was waived, are cited by appellant's counsel. These cases afford the basis for the contention that the right of trial by jury was enjoyed before the adoption of the present Constitution.

The mere fact that prior to 1875 the parties to suits on special tax bills frequently by tacit agreement tried their causes to a jury, or out of abundant caution caused the record to show an express waiver of a jury, does not of itself establish that the *right* to a jury trial existed. No statute conferred such right. If it existed it was by virtue of the constitution in force at that time, which, whether that of 1820 or that of 1865, merely guaranteed the continuance of the *common-law right* of trial by jury. And such is the right which the Constitution of 1875 pre-serves, but does not extend. [State v. Hamey, 168 Mo. 167; State ex rel. v. Withrow, 133 Mo. 500.] "This court has uniformly held that the provisions of the Constitutions of 1820 and 1865 that the right of trial by jury shall remain inviolate, and the provision of the Constitution of 1875 that the right of trial by jury as heretofore enjoyed shall remain inviolate, mean the right of trial by jury as it existed at common law." [Eckrich v. St. Louis Transit Co., 176 Mo. 621, 648.]

It is argued by respondent that as actions on special tax bills were unknown at common law there is no common-law right of trial by jury preserved inviolate by Section 28 of Article II of the Constitution. The construction of that provision as implied in the argument is, we think, too narrow. The right of trial by jury as it existed at common law may well include the right to such a trial not only in a common-law action, so called, but those of like nature in which that mode of trial is appropriate. [Colon v. Lisk, 153 N. Y. 188; North Penn. Coal Co. v. Snowden, 42 Pa. St. 488.] The question then revolves itself into whether the proceeding for the collection of special tax bills is analogous to an action at common law, or whether it is in the nature of a suit in equity.

Special assessments for local improvements are not debts. No personal judgment can be rendered for their recovery. Such special tax is merely a lien on the property against which it is assessed and its payment can be enforced only through a foreclosure of the lien. [Barber Asphalt Pav. Co. v. St. Joseph, 183 Mo. 451.] The lien is purely statutory, and, with respect to the one involved in this case,. no method for its enforcement is prescribed by the enactment creating it. It is difficult to see how it could be enforced in an ordinary common law proceeding. In Kansas City v. Field, 285 Mo. 253, it was held that where a statute creates a specific lien, and gives a specific remedy for the enforcement of such lien, a court of equity has no jurisdiction to enforce it, in the absence of some special ground of equitable inter-position, such as renders the remedy at law unavailable or inadequate. This further principle, however, was recognized; if a statute gives a lien and provides no particular mode to enforce it, equity will then supply a remedy. While the enactment creating the lien involved here (Section 5, Article XXIII, Charter of St. Louis) does not prescribe the particular method of enforcing it, it does provide that the tax bills "may be collected by action in any court of competent jurisdiction." The "action" thus authorized means one adapted to the en-forcement of the lien. [Const. Co. v. Ice Rink Co., 242 Mo. 241, 259.] The only action competent for that pur-pose, in the absence of a specific statutory mode of pro-cedure, is one in equity. The judgment in the present action established the lien and ordered the sale of the land against which it was charged to satisfy it. Not-withstanding a special execution was awarded, the pro-ceeding as to its objective was essentially a suit in equity, and therefore not triable to a jury. Such is the general holding with respect to suits of a similar character. [35 C. J. 164.]

II. The contention that the tax bills were not properly authenticated is based on the fact that the name of the president of the Board of Public Service and that of the comptroller were not appended to them. They were signed:

Authentication.

"By order of the Board of Public Service,

"LEO OSTHAUS,

"Assessor of Special Taxes,

"Registered and certified

"PAUL YOUNG, JR.,

"By order of the Comptroller."

Prior to the issuance of the tax bills Leo Osthaus was by resolution of the Board of Public Service designated as the person "who shall prepare, register, certify and sign special tax bills for all the special assessments of public work or improvements under this charter and ordinances adopted in pursuance thereof." And Paul Young, Jr., a clerk in the comptroller department, was by the comptroller designated in writing, "to countersign special tax bills of any character whatsoever issued under the authority of law or ordinance, the countersigning of such special tax bills to be in the form given below, which will be his official signature in the registering and certification of such special tax bills." The form referred to was:

"Paul Young, Jr.

"By order of the Comptroller."

Section I of Article 23 of the charter then in force (Charter of 1914) provided as follows:

"For all special assessments for public work or improvements under this charter and ordinances adopted in pursuance thereof, special tax bills shall be prepared and signed by a person designated by the Board of Public Service by resolution entered on its records; and shall be made payable to the parties entitled, either at the Collector's office or at some bank or trust company in the city, at the option of the party so entitled. They shall be promptly registered and certified both in the

office of said board and of the comptroller by persons designated by said board and by the comptroller, respectively to make such registration and certificate, and then delivered by the comptroller to the parties entitled and their receipts taken therefor.''

It thus appears that the preparation and authentication of the special tax bills were made in literal compliance with the charter provisions. Appellant's contention that the tax bills should have been signed in the names of the president of the Board of Public Service and the Comptroller is based on Sections 183 and 786, Revised Code of St. Louis 1914. The first, so far as material, is as follows:

''The comptroller is hereby authorized to designate any person or persons in his department to countersign his name to special tax bills issued under the authority of law or ordinance. Such designation or designations shall be in writing and on the same sheet of paper therewith each person so designated shall write the signature of the comptroller in the form in which he will so countersign special tax bills.''

The second provides:

''The president of the board of public service is hereby authorized to designate an assistant clerk or other subordinate to sign the name of the said president to vouchers, requisitions for supplies, and other official documents. Such designations shall be in writing and on the same sheet of paper therewith the assistant or the clerk or the subordinate so designated shall write the signature of the president of the board of public service in the form in which he will execute vouchers, requisitions and other official documents.''

It will be seen from the charter provisions heretofore quoted that the signature of the president of the Board of Public Service is not necessary to give effect to special tax bills. His signature whether subscribed by himself or by another would perform no function in validating them. They must be signed by some person

designated by the Board of Public Service. Neither has the comptroller any authority to countersign them. He has merely the power to appoint someone to do so. The provisions of the charter with respect to the preparation, registering and certification of special tax bills are full, complete and self enforcing. No ordinance is required to supplement them. It follows that the ordinances referred to, in so far as they are in conflict with these provisions, are void.

III. It is contended that the provisions of the charter concerning the classification of sewers, in force at the time of the passage of the ordinances authorizing the Mill Creek Joint District Sewer (set out at length in the opinion in the Haeussler case), were out of harmony with the uniform state law on the subject and therefore void. There was not then, nor is there now, a uniform state law on the subject in the sense of a statute applicable alike to cities of all classes. However, there is a great similarity in the provisions of the statutes respectively authorizing cities of the several classes and those under special charters to establish sewer systems and construct public, district and joint district sewers. With respect to these and the analogous provisions of the charter, considered with reference to their general scope and purpose, we find no essential conflict. But even if there were the charter provisions would not for that reason be void. They deal with matters of essentially local municipal concern, with respect to which the city of St. Louis is authorized to legislate without regard to general state laws touching the same subject-matter. [In re East Bottoms Drain. & Levee Dist., 305 Mo. 577, and cases there cited.]

*Statutory Prescriptions.*

IV. It is next asserted that the special tax bills are void because the tax assessed against appellant's property is in excess of the benefit received. If that

were purely a judicial instead of a legisla-

**Assessment in Excess of Benefit.** tive question we should not hesitate to find the fact against appellant. There is no question but that all the property in the joint district, including appellant's, is served by the old Mill Creek Sewer. The new joint district sewer is auxiliary to that and enables it to function during the times of heavy rains. The old sewer was one hundred per cent overcharged whenever a heavy rainfall occurred. With the aid of the new one the storm sewage of the entire drainage area is effectually disposed of. The benefit inuring to all the property in the joint district, whether north or south of the new sewer, is manifest.

V. It is claimed that there were three overcharges in the computation of the amount due the contractor for which proportional reductions should be made in the tax bills. These relate to the steel sheet piling, the classification of concrete and pumpage from the shafts.

As stated the sewer from the river for a distance of 1990 feet was constructed in an open cut. In this cut steel-sheet piling was used to hold the walls

**Piling.** of earth intact during the construction. Quicksand was encountered throughout the entire distance and for that reason two rows of piling were deemed necessary and were driven. For all of which the contractor was allowed the contract price of $1.25 per square foot. It is the contention of appellant that by the terms of the contract the contractor was bound to have used piling of such weight that one row of it would have sufficed to have carried the work and that consequently he was not entitled to be allowed for two. The contract is not set out in the record. The provisions of it relating to steel-sheet piling as abstracted are as follows:

"*Where lumber bracing and sheet piling are to be used.*—(11) Lumber, sheeting and bracing to be used as far as practical, but if in the opinion of Sewer Commissioner this is not sufficient he will issue written

orders for the use of steel-sheet piling as shown on plans. .   .   .

"*Use of steel-sheet piling and bracing.*—(13) Steel-sheet piling may be used on orders of the Sewer Commissioner when lumber is found inadequate. Steel-sheet piling specified; method of driving piling and payment therefor.

"*Driving of steel-sheet piling.*—(14)  Section shown on sheet 'C' of plan for concrete section specified, also method of driving piles in this section and basis of payment therefor."

These further fragments may be gleaned from quotations from the contract made by counsel during the oral examination of a witness:

"Steel-sheet piling may be used on written orders of the Sewer Commissioner when lumber bracing is found to be inadequate.   .   .   .

"The design and weight of steel piling are left to the judgment of the contractor, but they must be of sufficient strength to properly carry on the work. The length of the piling, if ordered driven, is to be 35 feet."

From all of these we conclude that the use of steel-sheet piling was left very largely to the judgment and discretion of the Sewer Commissioner, who was the city's supervising engineer of the work. It does not appear that the two rows of piling were not ordered driven by him, nor that one row of greater weight would have as adequately served the engineering purpose in hand as two. He testified:

"The work was constructed in quicksand, I think, from Second Street clear up to Broadway, and it took double rows, and in some instances we had to cross the sewer with it-to hold out the quicksand, in order to build the sewer."

From the evidence before us we are unable to say that the allowance for steel-sheet piling was not in strict conformity with the terms of the contract.

The complaint with respect to the concrete is "that 3000 yards of concrete were transferred from Class A to Class B (for which a higher price was allowed) in the first section, and 6000 yards of concrete in the second section, with no data to support the transfers." It is impossible to tell from the abstract before us what the provisions of the contract were with respect to the uses of the different classes of concrete in the construction. It does appear "that the Sewer Commissioner shall, in all cases, determine the amount or quantity or the classification of the several kinds of work or material which are to be paid for under this agreement, and that he shall decide all questions which may arise relative to the execution of this agreement, and his estimates and decisions shall be final and conclusive." The commissioner testified:

*Concrete Classification.*

"I had at least ten or twelve, sometimes twenty cases a day, where, using my authority, it was necessary for me to transfer classification A to B and B to A, etc., etc. I was the final umpire, and where an engineer made a classification which I did not consider fair to the city, I changed it. Now, these figures were made and presented to me for final approval, and if I did not approve then I changed the classification from B to A or A to B, as the case may be."

Under the terms of the contract his decisions as to the classification of the concrete, in the absence of fraud or collusion, were final and conclusive.

The contract provisions with reference to pumping as abstracted were as follows:

*"Pumping.*—(17)   Payment for water pumped as per bid; excavation for pumping to be filled with concrete; cost of which to be included in pumping bid. . . . For pumping from shafts, per million foot gallons, twenty cents."

*Pumping.*

The contractor was allowed $22,246.43 for pumpage. The amount of water pumped was not measured by a meter. With respect to the computation on which the allowance was based the city's engineer testified: "The

meters failed to work. In some shafts we paid force account on it, and in some we calculated the amount.'' The objection to the allowance is based solely on the fact that the water was not measured by a meter. The contract does not expressly so require. It is not claimed that the amount of water for which the allowance was made was not in fact pumped, nor that the method of computation employed by the city engineer in determining the amount was not accurate. The appellant's contention must be disallowed.

The questions raised by appellant's other assignments of error are fully considered and disposed of adversely to his contentions in the Haeussler case to which reference has heretofore been made.

It follows that the judgment of the trial court should be affirmed. It is so ordered. *Graves, C. J., David E. Blair, Walker* and *White, JJ.,* concur; *James T. Blair* and *Woodson,* JJ., not sitting.